AMERICAN CONSTITUTIONAL LAW FOUNDATION, INC., David Aitkens, Jon Baraga, Craig Eley, Jack Hawkins, Lonnie Haynes, Alden Krautz, Bill Orr, individually and as the Parent and Guardian of William David Orr, Plaintiffs,

v.

Natalie MEYER, individually, and as Secretary of State for the State of Colorado, Defendant.

Civ. A. No. 93–M–1467.

United States District Court, D. Colorado.

Nov. 23, 1994.

Neil D. O'Toole, Dallas, Holland & O'Toole, P.C., Denver, CO, for plaintiffs.

Bill Orr, pro se.

Maurice Knaizer, State of Colo., Asst. Atty. Gen., Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, Chief Judge.

This is an action for declaratory and injunctive relief under 42 U.S.C. § 1983 from restrictions regarding the circulation and submission of petitions to propose laws and constitutional amendments in the State of Colorado. The principal contention is that the challenged requirements restrict freedoms protected by the First and Fourteenth Amendments to the United States Constitution.

The plaintiff, American Constitutional Law Foundation, Inc., is a non-profit, public-interest organization supportive of this form of direct democracy. The individual plaintiffs, excepting William David Orr, have participated in the petitioning process. Jack Hawkins worked in support of petitions described as the Colorado's Safe Workplace Initiative and Worker's Choice of Care. Jon Baraga has been the state coordinator for the Colorado Hemp Initiative. William David Orr, a minor, wants to circulate petitions. All of the plaintiffs have shown sufficient commitment to continuing efforts to address the Colorado electorate through petitions for the Initiative and referendum to establish standing to bring this action and to make the issues justiciable within the jurisdiction provided by 28 U.S.C. § 1343. The legal questions have been presented within the context of an evidentiary record submitted in support of cross motions for summary judgment and at a trial to the court. There are no material factual disputes.

## COLORADO LAW

The focus of the plaintiffs' pleadings is an act of the General Assembly of the State of Colorado identified as Senate Bill 93–135, amending and relocating provisions concerning the initiative and referendum in Article 40 of Title 1 of the Colorado Revised Statutes. In the pre-trial order, the plaintiffs summarized their claims that this legislation violates protections found in the First, Ninth and Fourteenth Amendments to the United States Constitution in the following ways:

A) Non-registered voter prohibition on petition circulation.

B) Prohibiting circulators under the age of 18 to circulate.

C) Restricting circulating petitions to an arbitrarily set time period of six months.

D) Prohibiting circulation of petitions without badge identification.

E) Mandating certain requirements for paid circulators.

F) The affidavit circulator provisions are vague so as to make competent compliance impossible.

G) The disclosure provisions on paid circulators are unconstitutionally burdensome.

Pre-trial Order of June 1, 1994.

Some of the provisions in S.B. 93–135 simply recodify the existing law in Colorado and some repeat requirements in the Colorado Constitution. A brief historical review of the development of direct democracy in Colorado is necessary to achieve an appropriate perspective on the plaintiffs' contentions.

In 1910, voters in Colorado approved an amendment to Section 1 of Article V of the

Constitution of the State of Colorado, establishing the initiative and referendum. 1910 Colo.Sess.Laws 11. The initial paragraph of that amendment provides the premise for this reservation of legislative power in these words:

Section 1. The legislative power of the State shall be vested in the General Assembly consisting of a Senate and House of Representatives, both to be elected by the people, but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact and reject the same at the polls independent of the General Assembly, and also reserve power at their own option to approve or reject at the polls any act, item, section or part of any act of the General Assembly.

An exception to the power of the referendum was made for "laws necessary for the immediate preservation of the public peace, health or safety." As will be discussed, the Colorado General Assembly has routinely used this exception to avoid review of legislation by referendum by adopting a "safety clause" in each enactment. This organic act required that petitions be signed by qualified electors who must provide their residence addresses and the dates of signing. It also required the attachment of an affidavit of some qualified elector verifying the signatures.

While this section of the constitution was self-executing, the Colorado General Assembly has, from time to time, legislated additional requirements. Thus, in 1913, the General Assembly enacted H.B. No. 1 directing that each initiative and referendum petition bear a warning that it is a felony for anyone to sign with any name other than his or her own, or to knowingly sign more than one petition, or to sign when not a qualified elector. 1913 Colo.Sess.Laws 310. That act required that the signers must include the street and number of their residences; it repeated the provision for an attesting affidavit by a qualified elector; it established a format for petitions and it directed that each petition designate not less than three nor more than five representatives of the signers. Provision was made for a protest and a hearing on the sufficiency of the petition. The legislation also imposed requirements for the ballot title and publication of arguments for and against the measure.

In 1919, the Colorado General Assembly enacted S.B. No. 141 establishing a procedure to fix a ballot title for an initiated measure and limiting the time for circulation to six months from the date that the title and submission clauses have been provided. 1919 Colo.Sess.Laws 436.

In 1941, the General Assembly enacted H.B. No. 947. It prohibited the payment of "any money or other thing of value in consideration of or as an inducement to the circulation of any initiative or referendum petition" and established a criminal penalty for such conduct. 1941 Colo.Sess.Laws 480. That provision came before the Colorado Supreme Court in *Urevich v. Woodard*, 667 P.2d 760 (Colo.1983), in the context of circulation of an initiative petition by ACORN, a non-profit organization whose circulators were to solicit financial contributions to the organization in exchange for payment to them of a percentage of the contributions they collected. The court narrowly construed the prohibiting language to avoid a conflict with Article V Section 1 of the Colorado Constitution and held that ACORN's method of petition circulation and solicitation of contributions did not violate the statute. In the opinion for the unanimous court, Justice Rovira noted the provision in Article II, Section 2 of the Colorado Constitution that the people of the State of Colorado "have the sole and exclusive right of governing themselves" and observed that the reservation of the power to initiate legislation in Article V, Section 1 is a right "of the first order." After also noting that the Colorado Supreme Court had previously recognized the authority of the legislature to enact legislation regarding the exercising of this reserved power, he wrote:

The balance between the legislative power of the general assembly and the legislative power of the people has been struck in favor of the people in the fundamental charter of our state. No statute passed by the general assembly can be permitted to alter this allocation of power.

*Id.* at 762–3.

Legislation changing those persons authorized to circulate petitions from qualified electors to registered voters was enacted in 1971. That statute was ruled unconstitutional in *Colorado Project–Common Cause v. Anderson*, 178 Colo. 1, 495 P.2d 220 (1972) because it was inconsistent with Article V, Section 1. Chief Justice Pringle wrote the opinion for the unanimous court, saying:

> It is axiomatic that there are more citizens of this state who have the qualifications to register than there are those who actually register. The statutory requirement that the signing and circulating of petitions must be by *registered electors* rather than permitting *qualified electors* to carry on these functions is therefore a limitation not authorized by the constitution and is impermissible. *Id.* 495 P.2d at 222.

The statutory prohibition of payment to circulators enacted in 1941 was challenged under Federal law in 1984. That statute was held to be a violation of the First and Fourteenth Amendments to the United States Constitution by the Tenth Circuit Court of Appeals in *Grant v. Meyer*, 828 F.2d 1446 (10th Cir.1987), affirmed by a unanimous opinion of the Supreme Court in *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988). See discussion *infra*, p. 7.

The requirement that only registered electors could sign and circulate petitions was again imposed in 1980 through an amendment to Article V, Section 1 of the Colorado Constitution, pursuant to a referendum approved by Colorado voters. To be a registered elector in Colorado, a person must be at least 18 years old, a citizen of the United States and a resident of Colorado for at least 25 days before an election. C.R.S. § 1–2–101 (Supp.1994).

A significant change made by S.B. 93–135, is an amendment to C.R.S. 1–40–112(2) (Supp.1994) adding a requirement that petition circulators wear identification badges as follows:

(a) All circulators who are not to be paid for circulating petitions concerning ballot issues shall display an identification badge that includes the words "VOLUNTEER CIRCULATOR" in bold-faced type which is clearly legible and the circulator's name.

(b) All circulators who are to be paid for circulating petitions concerning ballot issues shall display an identification badge that includes the words "PAID CIRCULATOR" in bold-faced type which is clearly legible, the circulator's name, and the name and telephone number of the individual employing the circulator.

S.B. 93–135 also imposed reporting requirements on the proponents of a petition when paid circulators are used. C.R.S. § 1–40–121 (Supp.1994) provides, in relevant part,

(1) The proponents of the petition shall file with the official who receives filings under the "Campaign Reform Act of 1974" for the election the name, address, and county of voter registration of all circulators who were paid to circulate any section of the petition, the amount paid per signature, and the total amount paid to each circulator. The filing shall be made at the same time the petition is filed with the designated election official. . . .

(2) The proponents of the petition shall sign and file monthly reports with the designated election official, due ten days after the last day of each month in which petitions are circulated on behalf of the proponents by paid circulators. Monthly reports shall set forth the following:

(a) the names of the proponents;

(b) the name and the residential and business addresses of each of the paid circulators;

(c) the name of the proposed ballot measure for which petitions are being circulated by paid circulators; and

(d) the amount of money paid and owed to each paid circulator for petition circulation during the month in question.

To obtain access to the ballot at general elections under the statutory and constitutional law in effect in Colorado at the time of trial, proponents of an initiated measure must submit a draft of the proposal to the State Legislative Council and the Legislative Legal Services Office for review and comment. C.R.S. § 1–40–105(1) (Supp.1994). The draft then goes to the title board, which

prepares a title, submission clause, and summary. C.R.S. § 1–40–106 (Supp.1994). The title board's first meeting can be no earlier than the first Wednesday in December. C.R.S. § 1–40–106(1). No petition for an initiative measure can be circulated before the title, submission clause and summary have been fixed. C.R.S. § 1–40–108(1) (Supp.1994). This process can be delayed by a motion for rehearing before the title board filed by any registered elector and the dispute can be taken to the Colorado Supreme Court. C.R.S. § 1–40–107(2) (Supp.1994). Petitions must be filed with the Secretary of State within six months after the title, submission clause and summary have been fixed. The number of petition signatures must be equal in number to at least five percent of the total number of persons voting for all candidates for the Office of Secretary of State in the previous general election. Colo. Const. Art. V, § 1 (Supp.1994). The petitions must be filed with the Secretary of State at least three months prior to the election at which they are to be voted upon. *Id.*

## THE UNITED STATES CONSTITUTION

In *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), the Supreme Court concluded that the circulation of an initiative petition involved interactive communication characterized as "core political speech" within the protection of the First Amendment, applicable to the states under the Fourteenth Amendment. The court identified the invalid aspects of the statutory prohibition of payment of circulators in these words:

> The refusal to permit appellees to pay petition circulators restricts political expression in two ways: First, it limits the number of voices who will convey appellees' message and the hours they can speak, and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion. *Id.* at 422–423, 108 S.Ct. at 1892.

The burden of the state to justify such a restriction was described in the following paragraph:

> We agree with the Court of Appeals' conclusion that the statute trenches upon an area in which the importance of First Amendment protections is "at its zenith." For that reason, the burden that Colorado must overcome to justify this criminal law is well-nigh insurmountable. *Id.* at 425, 108 S.Ct. at 1894.

■ It is familiar learning that governmental infringements on political speech undergo strict scrutiny to determine if they are substantially related to a compelling governmental interest and are so narrowly drawn as to be the least restrictive means of furthering that interest. *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976); *NAACP v. Alabama,* 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 (1958).

■ The Supreme Court has not applied the strict scrutiny standard to all legislation affecting the right to vote and the freedom of association with others for political purposes. The state's interest in fair, honest and orderly elections has been recognized as a justification for some burdens on political liberty. In *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), Justice White wrote of the difficulty in establishing a rule of general application. In *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), an Ohio statute imposing an early filing deadline on independent candidates for President was invalidated by a divided court as an undue burden when balanced against the state's interests in voter education, political stability and equal treatment with partisan candidates. In *Norman v. Reed,* 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992), the Court again divided over limitations on ballot access by a newly formed political party.

Justice White addressed the problem of articulating a test for constitutionality again in *Burdick v. Takushi,* —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), writing for the majority in affirming a prohibition of

write-in candidates in Hawaii. There, he wrote:

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983). Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently. See Brief for Petitioner 32–37. Accordingly, the mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny." *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972); *Anderson, supra,* 460 U.S. at 788, 103 S.Ct. at 1569–1570; *McDonald v. Board of Election Comm'nrs of Chicago,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).

> Instead, as the full Court agreed in *Anderson, supra,* 460 U.S. at 788–789, 103 S.Ct. at 1560–1570; *id.,* at 808, 817, 103 S.Ct. at 1580, 1584–1585 (Rehnquist, J., dissenting), a more flexible standard applies. A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.,* at 789, 103 S.Ct. at 1570; *Tashjian [v. Republican Party of Connecticut], supra,* 479 U.S. [208] at 213–214, 107 S.Ct. [544] at 547–548 [93 L.Ed.2d 514].

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed,* 502 U.S. 279, ——, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson, supra,* 460 U.S. at 788, 103 S.Ct. at 1570; see also *id.,* at 788–789, n. 9, 103 S.Ct. at 1570, n. 9. We apply this standard in considering petitioner's challenge to Hawaii's ban on write-in ballots.

The Tenth Circuit Court of Appeals recently concluded that the state's interest in voter education supported a Kansas statute imposing a deadline for independent candidates to file nominating petitions which was characterized as a slight burden upon the rights of voters. *Hagelin for President Committee v. Graves,* 25 F.3d 956 (10th Cir. 1994).

Under the guidance of these cases, the analysis of the claims in this case must proceed by defining the character of the rights affected, the extent of the injury to those rights and then the nature and magnitude of the competing interests of the state.

### THE PLAINTIFFS' CLAIMS

■ The plaintiffs have adequately demonstrated that compelling circulators to wear identification badges inhibits participation in the petitioning process. Jon Baraga recounted harassment that he personally experienced while circulating a hemp initiative petition and testified that the identification badge requirement made it more difficult to find circulators because of a fear of recrimination, retaliation and harassment. The plaintiff Hawkins testified that he found that potential circulators were not willing to wear

personal identification badges required by this statute. The plaintiffs have shown that this requirement burdens core political speech. The strict scrutiny standard applies.

■ The defendant contends that the requirement is justified because it serves two compelling state interests: (1) The badges allow the public to identify the petition circulator in the event a complaint is filed; and, (2) the badges demonstrate to the public whether or not there is grassroots support for an initiative.

The defendant has presented some anecdotal evidence of circulators misrepresenting the effects of law changes proposed by their petitions and the inability of the observers to report these incidents because they could not identify those circulators. Assuming that such misstatements could be considered sufficient for prosecution, the state's interest in pursuing these matters is insufficient under the strict scrutiny standard. Misstating the expected consequences of changes in the law is not uncommon in the political process. Inaccuracies in political discourse do not necessarily rise to the level of calculated falsehood or criminal fraud. *See Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964). The defendant's concern that some circulators may use deliberate falsehoods to obtain signatures does not justify this burden on all circulators. The current criminal penalties for violations of the laws governing initiative and referendum petitions are sufficient to deter dishonest circulators. C.R.S. § 1–40–130 (Supp. 1994). Therefore, the state's interest in honesty in public discussion of governmental issues is not so compelling as to warrant the identification of those who choose to speak in support of change. Moreover, a prohibition of anonymous distribution of campaign literature was ruled invalid in *Wilson v. Stocker,* 819 F.2d 943 (10th Cir.1987). There, the Court relied on *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), voiding an ordinance banning all anonymous handbills. The Court recognized the historical importance of anonymity in political speech under certain circumstances. The types of controversy generated by such initiatives as the Hemp Initiative present such circumstances.

The relationship of the badges to the demonstration of grassroots support is not made on the record. Here, as in *Grant v. Meyer,* the State's interest in a demonstration of sufficient support is met by the requirement of a percentage of the votes cast in the previous election for Secretary of State. *Grant v. Meyer, supra,* 828 F.2d at 1455. The badge identification requirement substantially affects the number of potential circulators which translates into a corresponding decrease in the amount of protected political speech. The state's articulated interests are not compelling and the restriction has not been narrowly drawn to further those interests. Accordingly, the badge requirement is a violation of the First and Fourteenth Amendments and is therefore unconstitutional.

■ S.B. 93–135 requires that circulators be registered electors who are eligible to vote on the measure which is the subject of the petition. It also requires the circulators to be at least 18 years of age at the time of the circulation. C.R.S. § 1–40–112(1) (Supp. 1994). Nothing in the record suggests any statewide ballot issues as to which the qualifying phrase "who are eligible to vote on the measure" would be a restriction beyond the requirement of registration. The record does show that the requirement of registration limits the number of persons available to circulate and sign these petitions and, accordingly, restricts core political speech. However, the source of this requirement is not S.B. 93–135; it is the constitutional amendment adopted by the people in 1980. There is nothing in the United States Constitution that requires that any state provide for the initiative or referendum. The people are the source of the power and they may exercise their sovereign authority to limit the scope of that power so long as there is no discriminatory classification. The Colorado electorate chose to restrict participation in the petitioning process to registered electors. This decision is not subject to any level of scrutiny by this court in the context of this case.

The claim of the minor plaintiff, William David Orr, that because he is under 18 years of age he is eliminated from participation in political speech as a circulator is answered by this restriction to registered electors. As previously noted, qualified voters in Colorado must be at least 18 years old, and the requirement of being a qualified elector goes back to the original provision for the initiative made in the constitutional amendment adopted in 1910. There is, therefore, no need to justify the age requirement as a separate limitation.

 The report required by the provision in S.B. 93–135, codified at C.R.S. § 1–40–121(1) (Supp.1994), is an extension of the requirements contained in the Colorado Campaign Reform Act of 1974, C.R.S. § 1–45–101, *et seq.* The Campaign Reform Act requires political committees supporting or opposing a statewide issue to file a statement of organization with the state and requires the filing by the campaign treasurer of reports of all contributions received and expenditures made by or on behalf of such a political committee. C.R.S. §§ 1–45–106 & 108 (Supp.1994). These reports must be submitted 11 days before and 30 days after the election. *Id.* S.B. 93–135 added a requirement that proponents of a petition, at the time of filing, must disclose the names, addresses and county of voter registration of all circulators paid to circulate any section of the petition together with the amount paid for each signature and the total amount paid to each circulator. C.R.S. § 1–40–121(1) (Supp. 1994). This requirement prevents anonymity of the circulators and thus exposes them to intimidation, harassment and retribution in the same manner as the badge requirement.

The legislative history shown in the record and the evidence presented at the trial show that since *Meyer v. Grant* the circulation of initiative petitions has become a business and the proponents of several petitions, particularly those seeking authorized gambling, have hired contractors to do the circulation.

Given the business of circulation for hire, there is an interest in compelling disclosure by the proponents of the persons or entities being hired, not only to prevent fraud but to give the public information concerning who the principal proponents are and what kind of financial resources may be available to them. What may appear to be grassroots support might in actuality be well financed special interests with hidden agenda. That legitimate interest, however, is not significantly advanced by disclosure of the names and addresses of each person paid to circulate any section of the petition. What is of interest is the payor, not the payees.

The final report is a ballot access requirement. It serves the same purposes as the Campaign Reform Act—the prevention of fraud and the education of the electorate as to the source of support for the measure submitted through this process. Upon elimination of the provision requiring identification of the circulators, the burden on the proponents is slight. This requirement, as modified, is valid.

 The statute also requires petition proponents to file monthly reports on paid circulators. C.R.S. § 1–40–121(2) (Supp.1994). As noted above, to the extent the monthly report requirement includes the name and residential and business addresses of each of the paid circulators, it is constitutionally invalid. The other requirements of the monthly reports are the names of the proponents, the name of the proposed ballot measure for which petitions are being circulated by paid circulators and the amount of money paid and owed to each paid circulator for petition circulation during the month in question. Preparation of the monthly reports is burdensome and involves an additional expense to those supporting an initiative or referendum petition. The testimony presented shows that the monthly reports affect the circulation process and therefore the amount of core political speech. The state has failed to demonstrate how the monthly reports meet the stated objectives of preventing fraud as compared with the final report to be filed when the petitions are submitted to the designated election official. The monthly reports are restrictions on core political speech and are invalid.

 The plaintiffs assert and have presented evidence to support their contention that the requirement that the petitions be

circulated within a six month period, C.R.S. § 1-40-108(1) (Supp.1994), is an undue restriction on core political speech. While it does, indeed, affect the quantity of such speech, the primary purpose is the preparation of an orderly ballot. The defendant has presented evidence of successful circulations and there have been many initiated measures on the election ballots in Colorado as demonstrated in defendants' Exhibits H and I. Testimony of witnesses who successfully placed measures on the ballot shows that with planning and a proper preparation of the ballot title, there are at least four months for active solicitation of signatures and that has been adequate. Viewing this issue as a ballot access measure and considering the importance of fixing a proper title for the legitimate objective of voter education and fairness, the court finds and concludes that the six month limitation is not an unreasonable burden on the rights of either the proponents of the petition or of the voting public.

■■■ The plaintiffs have made a general challenge to the requirement of an affidavit by the circulators enacted in S.B. 93-135 and now appearing in the code as 1-40-111(2) (Supp.1994) which provides as follows:

(2) To each petition section shall be attached a signed, notarized, and dated affidavit executed by the registered elector who circulated the petition section, which shall include his or her printed name, the address at which he or she resides, including the street name and number, the city or town, the county, and the date he or she signed the affidavit; that he or she has read and understands the laws governing the circulation of petitions; that he or she was a registered elector at the time the section of the petition was circulated and signed by the listed electors; that he or she circulated the section of the petition; that each signature thereon was affixed in the circulator's presence; that each signature thereon is the signature of the person whose name it purports to be; that to the best of the circulator's knowledge and belief each of the persons signing the petition section was, at the time of signing, a registered elector; and that he or she has not paid or will not in the future pay and that

he or she believes that no other person has so paid or will pay, directly or indirectly, any money or other thing of value to any signer for the purpose of inducing or causing such signer to affix his or her signature to the petition.

This is a recognition of the central function of the circulator in preventing fraud and insuring accuracy in the petition signing process. The requirement that the attesting circulator include his or her name and residential address raises the same concerns as the monthly reports by the proponents and to some extent the identification badge requirement. The difference is that the affidavit requirement has the primary purpose of providing the opportunity for an adequate hearing on the sufficiency of the signatures for the petition and for other matters relevant to placing the measure on the ballot. Here, then, the identification must be considered in terms of the state's power to regulate ballot access. There is a compelling necessity to be able to summon circulators to provide testimony at a hearing on challenges to the validity of the signatures and for other matters relevant to the petitioning process.

There is a qualitative difference between requiring name and residence identification on an affidavit for the sections of the petition circulated by the identified individual and the inclusion of his or her name and address in monthly reports or on badges displayed on the street. That difference is a matter of access. Those who may seek this identifying information for such purposes as retaliation or harassment will have considerably greater difficulty in finding these names and addresses in the masses of papers filed with the petitions as compared with the monthly reports and the identification badges. Even assuming a strict scrutiny standard, the court finds that the state's compelling need for the names and addresses of the circulators is justified and this requirement is sufficiently narrowly drawn to be constitutional.

■■■ The plaintiffs also argue that the circulator affidavit requirement, as it is reiterated in C.R.S. § 1-40-116(1) (Supp.1994), is unconstitutionally vague because it requires circulators to aver, without personal knowledge, that all circulators have complied

with C.R.S. § 1–40–101 *et seq.* While not artfully drafted, this section is not unconstitutionally vague. The general reference to circulator affidavits in § 1–40–116 is controlled by the specific affidavit requirements in C.R.S. § 1–40–111(2), *supra. See* C.R.S. § 2–4–205 (1980 Repl.Vol. 1B). Section 1–40–111(2) simply requires that the circulator attest that he or she has circulated a section of the petition in compliance with the initiative statute. The statute does not require each circulator to attest to the validity of the other circulators' sections of the petition.

The plaintiffs have contended that the Ninth Amendment to the United States Constitution has been violated by these limitations on the reserved power of the initiative and referendum. That amendment provides:

> The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

That broad language has seldom been used by the courts as a basis for invalidating legislation. It is not applicable here because the rights enumerated by the First and Fourteenth Amendments are adequate to the determination of the issues presented in this case.

As previously noted, the Colorado General Assembly has routinely used a "safety clause," providing that its legislative enactments are necessary for the immediate preservation of peace, health and safety to avoid a petition for a referendum and the inclusion of such a clause in S.B. 93–135 prevented a referendum on it. This court previously denied the plaintiffs' motion for a preliminary injunction based on a claim of invalidity of that legislative statement. In part, that decision rested on the conclusion that the plaintiffs were free under the initiative power to propose any measure by petition. They could have initiated a repeal of S.B. 93–135. There is a more fundamental reason to reject the request that this court invalidate a safety clause in any legislative enactment. It is the doctrine of separation of powers. No matter how routinely the General Assembly may attach such clauses in legislative measures, before any court can invalidate that provision in any particular bill, that court must make a

determination that the particular legislation could not possibly have any relevance to the immediate preservation of the public peace, health or safety. That is a political question which no court is empowered to answer. The safety clause in S.B. 93–135 was a valid provision in that legislation.

Upon the foregoing, it is

ORDERED that judgment will enter declaring that the following provisions of the Colorado Revised Statutes are invalid because they are in violation of the First and Fourteenth Amendments to the United States Constitution, and ordering that the defendant Secretary of State of the State of Colorado is permanently enjoined from enforcing those provisions: C.R.S. § 1–40–121(1) (Supp.1994) to the extent that it requires the proponents of a petition for the initiative or referendum to provide "the name, address, and county of voter registration of all circulators who were paid to circulate any section of the petition" and the names of circulators in reporting the amounts paid to circulators; C.R.S. § 1–40–121(2) (Supp.1994) in its entirety, and C.R.S. § 1–40–112(2) (Supp.1994) in its entirety. All other claims of the plaintiffs shall be dismissed. The plaintiffs shall have to and including December 5, 1994, within which to file any claim for attorney's fees under 42 U.S.C. § 1988.