Kent BERNBECK, Stan Dobrovolny, Richard Bellino, Angela L. Crouse, Gwen Kutschkau, and Betty Cowart, Plaintiffs,

v.

Scott A. MOORE, Secretary of State for the State of Nebraska, individually and officially, Defendant.

No. 4:CV96–3263.

United States District Court, D. Nebraska.

Aug. 15, 1996.

John M. Boehm, Lincoln, NE, for Plaintiffs.

J.L. Spray, Stephen D. Mossman, Mattson, Ricketts, Davies, Stewart & Calkins, Lincoln, NE, for Defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This case presents the question of whether the efforts of the Nebraska legislature to statutorily limit the right to initiate changes in the state constitution by circulating petitions infringe upon Plaintiffs' federal constitutional rights. The Nebraska legislature has enacted legislation prohibiting and criminalizing the circulation of initiative petitions by persons who have not been registered to vote for one month prior to the circulation of the petitions. *See* Neb.Rev.Stat. §§ 32–629, 32–630, 32–1404, 32–1546 (Michie 1995).

Plaintiffs allege in "Cause of Action I" that these restrictions violate their First Amendment rights. (Filing 1, ¶¶ 20–21.) Betty Cowart, the lone nonNebraska resident, alleges in "Cause of Action II" that the restrictions violate the "Privileges and Immunities Clause," (Filing 1, ¶¶ 22–23), and in "Cause of Action III" that they violate the "Commerce Clause." (Filing 1, ¶¶ 24–25.)

After a bench trial, I find and conclude that:

1. With the exception of Cowart, the statutory requirement that initiative petition circulators be registered voters violates Plaintiffs' First Amendment right of free speech;

2. With the exception of Cowart, the statutory requirement that initiative petition circulators be registered voters for one month violates Plaintiffs' First Amendment right of free speech;

3. Because Cowart did not appear at trial and there is insufficient evidence that she was actually injured or will be actually injured in the future, I dismiss all of Cowart's claims for lack of a case or controversy without reaching the merits of her claims.

Accordingly, I shall award declaratory relief and enjoin the Nebraska Secretary of State from enforcing the relevant Nebraska statutes.

Pursuant to Federal Rules of Civil Procedure 52(a) and 65(a)(2), the findings of fact and conclusions of law that have informed my decision are set forth below.[1]

### I.

*I find the material facts to be these:*

### Nebraska Constitution

1. Article III, Section 1, of the Nebraska Constitution reserves the power to propose laws and amendments to the constitution to "the people" in these words: "The people reserve for themselves ... the power to propose laws, and amendments to the constitution, and to enact or reject the same at polls, *independent of the Legislature....*" (Emphasis added.)

2. Article III, Section 2, of the Nebraska Constitution describes the method for this type of proposal in these plain and simple words: "This power may be invoked by petition wherein the proposed measure shall be set forth at length."

3. Article III, Section 4, of the Nebraska Constitution provides that these constitutional "provisions with respect to the initiative" are "self-executing, but legislation may be enacted to facilitate their operation."

4. Defendant concedes the Nebraska Constitution neither imposes residency requirements for petition circulators nor requires petition circulators to be registered voters:

> THE COURT: Just so we're clear, the Nebraska Constitution does not provide residency requirements for petition circulators and it does not require petition circulators to be registered voters?
>
> COUNSEL FOR DEFENDANT: No.

(1 Tr. 20.)

5. Defendant further concedes the words "we the people" in the Nebraska Constitution do not "refer only to registered voters." (*Id.*)

---

1. Any finding of fact more properly considered a conclusion of law shall be so construed. Alternatively, any conclusion of law more properly considered a finding of fact shall be so construed.

### Nebraska Statutes and Petition Circulators

6. In 1995, after pointed debate about the evils of paid circulators,[2] (Pls.' Ex. 6; Def.'s Ex. 122), the Nebraska legislature passed L.B. 337, approved by the governor on June 1, 1995. (Def.'s Ex. 122, at 9078.) *See* L.B. 337, 94th Neb.Leg., 1st Sess. (June 1, 1995) (effective Sept. 9, 1995) (available on Westlaw, NE–LEGIS 95, at NE–LEGIS 337).

7. Section 4 of L.B. 337 was codified in Neb.Rev.Stat. § 32–1404 (Michie 1995). This statute provides in pertinent part that "circulators ... shall meet the requirements of sections 32–629 and 32–630" and that a "circulator shall have been registered to vote in Nebraska for one month prior to circulating an initiative or referendum petition."

8. Nebraska Revised Statute § 32–629 (Michie 1995) (incorporated by reference in § 32–1404) provides that "[o]nly a registered voter of the State of Nebraska shall qualify as a valid signer or circulator of a petition and may sign or circulate petitions" except that any person "who is or will be a registered voter in the State of Nebraska on or before the date on which the petition is required to be filed with the Secretary of State may sign an initiative or referendum petition." Thus, while one must be a registered voter for one month in order to circulate petitions in Nebraska, one who is not a registered voter may validly sign, as opposed to circulate, a petition so long as he or she will be registered to vote on or before the date the petition is required to be turned in to the Secretary of State.

9. Nebraska Revised Statute § 32–630(3)(c) (Michie 1995) (incorporated by reference in § 32–1404) states in pertinent part that "[n]o person shall ... circulate a petition if he or she is not a registered voter and qualified to ... circulate the same...."

Thus, Nebraska affirmatively prohibits any person from circulating a petition if he or she is not a registered voter "qualified to ... circulate the same" (registered to vote for one month).

10. Nebraska Revised Statute § 32–1546(1) (Michie 1995) makes it a crime to circulate a petition if the circulator is "not, at the time of ... circulating a petition, a registered voter and qualified to ... circulate the petition...." Such a crime is a Class I misdemeanor. *Id.*[3]

11. Petition circulators must sign an affidavit before a notary public on every sheet of the petition stating, among other things, that: (a) he or she is the circulator of the petition; (b) he or she is a registered voter of the State of Nebraska; (c) the persons who signed the petition did so in the presence of the circulator, and the date of the signatures is correctly stated on the petition; (d) the circulator believes the signer has written his or her name, street and number or voting precinct, and address correctly; (e) the circulator believes each signer was qualified to sign the petition; and (f) the circulator informed each signer of the purpose of the petition before he or she affixed his or signature. Neb.Rev.Stat. § 32–628(3) (Michie 1995). The circulator's address must appear immediately below his or her signature. *Id.* In addition, the petition must state whether the circulator has been paid or is a volunteer. *Id.* at § 32–628(4).

12. Nebraska law also requires in boldface type above the signatures on each page of each petition a warning that states in part that "VIOLATION OF ANY OF THE FOLLOWING PROVISIONS OF LAW MAY RESULT IN THE FILING OF CRIMINAL CHARGES." *Id.* at § 32–628(2). Among other things, this warning advises

---

2. For example, in disagreeing with Senator Witek "about why it was necessary to have no restrictions on these folks," Senator Wickersham stated, "I, frankly, do not want people coming into the State of Nebraska just because they are promised so much per signature, living in a motel room, scurrying around and then leaving the state with no share in the responsibility for what they have done." (Def.'s. Ex. 122, at 5177 (floor debate LB 377).) Accordingly, Senator Wickersham did not think Senator Witek "made

any sense at all." (*Id.*) This prompted Senator Witek, who did not believe it appropriate to "place a paid circulator ... somewhere beneath an attorney even," to respond that "I feel like I just got yelled at by my father." (*Id.* at 5177–78.)

3. Class I misdemeanors are punishable by a one-year term of imprisonment and a $1,000 fine. Neb.Rev.Stat. § 28–106 (Michie 1995).

petition circulators that any person who is not at the time of circulating a petition a registered voter qualified to circulate petitions shall be guilty of a Class I misdemeanor, and any person who falsely swears to a circulator's affidavit on a petition is guilty of a Class IV felony. *Id.*[4]

## Nebraska Statutes and the Verification Process

13. Section 6 of L.B. 337 was codified in Neb.Rev.Stat. § 32–1409(1) (Michie 1995). Nebraska Revised Statute § 32–1409(1) provides in pertinent part that election officials are "to determine if the circulator was a registered voter one month prior to the date of circulating and signing the petition," and if not, "[a]ll [such] signatures ... shall not be counted." *Id.* § 32–1409(3).

14. Nebraska Revised Statute § 32–1409(1) further requires election officials to ascertain that the persons who signed the petition (other than the circulator) were registered to vote on the date on which the petition was required to be filed with the Secretary of State. For the express purpose of preventing fraud, election officials are required to make three comparisons: (1) a comparison of the signature on the petition with the name on the voter-registration card; (2) a comparison of the printed name on the petition with the name on the voter-registration card; and (3) a comparison of the address on the petition with the address on the voter-registrations card. *Id.*

15. The secretary of state has given detailed instructions to election officials regarding how petitions are to be verified. (Def.'s Exs. A, 106.) In particular, the secretary of state has instructed election officials that if the "circulator is not registered ... for 30 days" or the "circulator's affidavit is not com-

pleted," then "there is no need to verify the individual signatures on the petition" because "they are not valid and should not be counted." (Def.'s Ex. 106, at 2.)

## The Petition Organizers

16. Plaintiff Kent Bernbeck (Bernbeck) lives in Lincoln, Nebraska, and works in the forensic unit of a state mental hospital. (1 Tr. 119.) Bernbeck, now 31, has been registered to vote in Nebraska since the age of 18. (*Id.*) Bernbeck co-chairs the Nebraska Term Limits Committee along with Bob Wright and State Senator Kate Witek, both of whom live in Omaha, Nebraska. (*Id.*) Among other things, this group sought to amend the Nebraska Constitution to provide instruction to all state and federal legislators to support and seek term limits and restore the signature requirements for petitions as they existed in Nebraska until 1994.[5] (Def.'s Ex. 101.)

17. Bernbeck hired the company that in turn hired petition circulators. (*Id.* at 120.) His organization began collecting signatures on March 12, 1996, and they hoped to gather at least 150,000 signatures.[6] (*Id.* at 121.)

18. In April, 1996, it became clear to Bernbeck that "there simply wasn't enough bodies carrying petitions for us to be successful." (*Id.*) Although the deadline for submitting petitions was July 5, 1996, (*id.* at 126), by the middle of May Bernbeck's organization had collected only around 23,000 signatures. (*Id.* at 122.)

19. In an effort to increase the number of petition circulators, Bernbeck consulted the company that had been hired to circulate petitions and learned that "[t]he people that were under the thirty-day rule were being turned away in what was reported large numbers." (*Id.* at 124.) Accordingly, Bern-

---

4. Nebraska Revised Statute § 32–1546(2) (Michie 1995) provides that a person "who falsely swears to a circulator's affidavit on a petition" is guilty of a Class IV felony. A Class IV felony is punishable by up to five years' imprisonment and a $10,000 fine. Neb.Rev.Stat. § 28–105 (Michie 1995).

5. *See Duggan v. Beermann,* 245 Neb. 907, 515 N.W.2d 788 (1994) (number of signatures required by Nebraska Constitution for placement of initiative petition to amend constitution on ballot is equal to 10 percent of number of regis-

tered voters on date signatures are to be turned in).

6. The parties stipulated in a related case that 98,938 signatures are needed to put an initiative regarding a constitutional amendment on the ballot. The evidence indicated that petition organizers attempt to secure substantially more signatures than necessary in order to insure "a margin or cushion for signatures that would be disqualified for various reasons." (*Id.* at 88.)

beck instructed the company to run more advertisements in an effort to hire paid circulators, but that effort was not successful. (*Id.* at 125.) Bernbeck also tried a mass mailing to supporters of the term limits initiative in an effort to obtain more volunteer help; however, that effort too failed. (*Id.*)

20. By May 20, 1996, Bernbeck's organization had garnered only about 23,000 signatures, and only 216 petition circulators were carrying petitions. (*Id.* at 126.)

21. After consulting a lawyer and reading an opinion of the Nebraska attorney general,[7] Bernbeck's organization decided they would not follow the "rule" regarding the 30–day registration requirement. (*Id.* at 125–26.) In effect, Bernbeck's group directed the petition-circulation company to violate the law.

22. Approximately six weeks after deciding not to follow the "rule," Bernbeck's organization, with the aid of the company hired to circulate petitions, had gathered more than 130,000 signatures using 700 petition circulators. (*Id.* at 126.) Of those 700 circulators, approximately 30 were professional circulators who did not live in Nebraska, and various other circulators did not meet the 30–day registration requirement even though they were Nebraska residents. (*Id.* at 127–29.) On July 5, 1996, Bernbeck's organization submitted to the Nebraska Secretary of State petitions favoring the term-limits initiative that contained roughly 159,000 signatures. (*Id.* at 126.)

23. While away at a summer home, Bernbeck allowed at least two petition circulators to use his residence address as their own for voter-registration purposes, although he never saw the circulators actually live at the residence. (*Id.* at 151–55; Def.'s Exs. 110, 111.)

24. Plaintiff Stanley D. Dobrovolny is a cattle rancher from Atkinson, Nebraska, and the organizer of a petition drive to amend the Nebraska Constitution to provide for property tax relief. (*Id.* at 75–76.) His testimony was very similar to that of Bernbeck. (*Id.* at 76–89.)

25. Specifically, Dobrovolny testified that six weeks prior to the deadline his group, which hired a company to circulate petitions, had been able to secure only 75,000 of the 115,000 to 120,000 signatures they had hoped to obtain. (*Id.* at 82–83.) Approximately ten days before the deadline, his group still had collected only around 90,000 signatures. (*Id.* at 85.) Consequently, during the third week of June, his group authorized the petition circulation company to use petition circulators "that had not met the thirty-day rule." (*Id.* at 85–86.) By July 5, 1996, when the petitions were turned in to the Secretary of State, Dobrovolny's group had collected approximately 108,000 signatures. (*Id.* at 85.)

26. Plaintiff Richard T. Bellino, is a keno operator from Papillion, Nebraska, and the organizer of a petition drive regarding "local option to put gambling in the cities throughout the state." (*Id.* at 95–96.) He too gave testimony similar to Bernbeck's. (*Id.* at 95–105.)

27. Specifically, Bellino testified that his group hired both their own petition circulators and a petition-circulation company and began soliciting signatures in the spring of 1996, (*id.* at 96–97), hoping to collect 130,000 to 150,000 signatures. (*Id.* at 97.) By approximately June 8, 1996, the group had collected only 19,000 to 20,000 signatures, and after unsuccessfully trying to hire petition circulators who could comply with Nebraska law, Bellino's group decided to "disregard the thirty-day requirement." (*Id.* at 99–103.) As a result, Bellino's group and the petition-circulation company were able to increase the number of paid circulators from about 130 to approximately 440. (*Id.* at 103–04.) At the time the petitions were turned in to the Secretary of State, Bellino's group had collected a total of 133,000 signatures, 113,-

---

**7.** On April 18, 1995, Nebraska's attorney general issued a legislative opinion stating that the "one-month waiting period for newly registered petition circulators violates Article III of the Nebraska Constitution as well as the First Amendment to the United States Constitution." Op. Att'y Gen. 95031, at 20 (Apr. 18, 1995) (filed April 19, 1995). A copy of that opinion is attached to the Brief of Amicus Curiae Attorney General. The Nebraska attorney general has appeared as an amicus curiae in this case, and urges that the "30–day waiting period should be declared unconstitutional." (Att'y Gen.'s Br. at 6.)

000 of them collected after the decision was made to disregard Nebraska law. (*Id.* at 102.)

28. Petition organizers had difficulty hiring paid petition circulators because there was strong competition for paid petition circulators due to the numerous petition drives that had been mounted and because the unemployment rate in Nebraska is below 3 percent. (*Id.* at 101; Pls.' Ex. 2.)

29. All the petition organizers testified they believed the challenged registration requirements harmed their petition-drive efforts.

### The Petition Circulators

30. Plaintiff Angela Crouse is a 19-year-old single mother who has lived in Nebraska for 9 years. (*Id.* at 40–42.) Crouse became a paid petition circulator working for her mother, Shirley Crouse, who managed the local office of a petition circulation company. (*Id.* at 45.)

31. Crouse registered to vote on May 8, 1996, and began circulating petitions before the 30-day waiting period expired. (*Id.*) Crouse supports all four petitions she circulated and intends to vote for each of the measures if they are placed on the ballot. (*Id.* at 47–48.) Crouse was unemployed before she took a job as a paid petition circulator, and became unemployed again when her job as a paid petition circulator ended. (*Id.* at 42.)

32. Plaintiff Gwen A. Kutschkau is a 36-year-old single mother of two and lifelong Nebraska resident. (*Id.* at 24–26.) Kutschkau lost her job in May, 1996, and soon talked to her friend Shirley Crouse about working for Crouse as a paid petition circulator. (*Id.* at 26–30.) Because Crouse told her she had to be a registered voter and wait 30 days before circulating petitions, and because she was not then registered to vote, Kutschkau decided to look for other employment. (*Id.* at 29.) Kutschkau also sought public assistance around this time. (*Id.* at 30.)

33. Approximately two weeks later, Crouse called Kutschkau and told her she need not wait 30 days; as a result, Kutschkau began circulating petitions for pay the day after she registered to vote in late May, 1996. (*Id.*) After first reading the petitions and learning about them from Crouse, (*id.* at 32), Kutschkau circulated petitions "morning till night" in many cities throughout Nebraska, frequently going door to door. (*Id.* at 33–35.) Kutschkau supports all the petitions she circulated and intends to vote for the measures if they are placed on the ballot. (*Id.* at 33.) Kutschkau was very good at her work and estimates she had a 95-percent success rate among the people she spoke with. (*Id.* at 35.) According to Kutschkau, she always explained the petitions fully to the people she solicited in part because she was fearful of being prosecuted for a crime if she misled anyone. (*Id.* at 38–39.) Kutschkau is presently employed by Hudson's Food in Columbus, Nebraska. (*Id.* at 26.)

34. Both Crouse and Kutschkau testified they were harmed financially by the challenged restrictions because those restrictions prohibited them from earning money for a time.

35. Plaintiff Betty Cowart is a nonresident who claims that she came to Nebraska in June, 1996, "to earn income by the circulation of initiative petitions." (Filing 1, ¶ 13.)

36. Cowart was not called as a witness and did not appear at trial. Plaintiffs' counsel tried to offer Cowart's affidavit to explain her absence, but a hearsay objection was made and sustained regarding the affidavit. (1 Tr. 165–66.) Plaintiffs rested without requesting a continuance to secure Cowart's testimony. (*Id.* at 167.) Defendant sought unsuccessfully to subpoena Cowart to attend trial by attempting to serve her with process at the Nebraska address on her voter-registration card. (*Id.* at 282–86; Def.'s Exs. 116, 117.)

37. There is a general lack of direct evidence concerning Cowart. What evidence there is reveals that Cowart operated a petition-circulation company in Nebraska that dealt with various petition drives including the one championed by Bernbeck. (1 Tr. 132–33; 261–64; Def.'s Ex. 128.)

### Secretary of State

38. Scott A. Moore, Nebraska's secretary of state, is the sole defendant in this case. He is sued both individually and officially.

39. Because Plaintiffs requested an expedited trial, and the court acceded to their request, Moore was unable to attend trial due to scheduling difficulties. He did, however, provide deposition testimony, subject to cross-examination. (Def.'s Ex. A.)

40. Moore is a former Nebraska legislator who was elected secretary of state in November, 1994. (Ex. A at 6.) Among other things, Moore is the "chief election officer . . . [and] administrator of the election laws" for the State of Nebraska. (*Id.* at 7.)

### Compelling Governmental Interest

41. Moore testified there are two compelling governmental interests behind the challenged restrictions. He described those interests as "maintenance of the integrity of the petition initiative process" and "prevention of fraud." (*Id.* at 50.)

42. With regard to "maintain[ing] the integrity of the initiative petition process," Moore explained it was his opinion that the petition process "is reserved for Nebraskans, people that live in Nebraska, make their livelihood here, will continue to live here." (*Id.*) Thus, the challenged restriction "further assures that people participating in the process are indeed Nebraskans." (*Id.*)

43. With regard to preventing fraud, Moore stated the challenged restrictions help prevent fraud in two ways. (*Id.* at 49.) First, the restrictions require circulators "to establish residency in Nebraska, be aware of Nebraska laws and have concern about Nebraska laws." (*Id.* at 49.) Second, the registration requirement provides a "record" of those circulating petitions that can be checked by the secretary of state and other interested parties. (*Id.* at 48–49.)

44. Senator Jerome Warner, a distinguished Nebraska legislator for more than 30 years, testified for the defense. (*Id.* at 207–13.) Senator Warner "co-introduced" L.B. 337. (*Id.* at 210.)

45. Senator Warner testified his reason for introducing the bill was to protect the integrity of the petition process and to prevent fraud. (*Id.* at 213.) Senator Warner

had previously supported the Nebraska law banning paid circulators. (*Id.* at 217.) In answering a question put to him by the court, Senator Warner stated, "[T]he primary reasons that [I] supported the ban on paid circulators and the 30–day requirement" are "essentially the same." (*Id.* at 218.)

### "Integrity of Initiative Process" Code for "Stop Carpetbaggers"

46. Patricia Hansen, a county election official, testified for the defense. (*Id.* at 172–83.) Hansen served on a 1994 task force that advised the legislature on L.B. 337. (*Id.* at 182; 210–11.)

47. Hansen made it clear the task force proposed the challenged registration restrictions to "hopefully prevent some out-of-state people from coming into circulate. I know that was kind of the idea." (*Id.* at 182.) Indeed, that was "why [she] supported it." (*Id.*) [8]

48. Defense counsel emphasized this point in his opening statement by suggesting the purpose of the challenged legislation was "to prohibit people from other states coming into our state and participating in our election process. In the old south, they'd call them carpetbaggers, and I think that's in essence what the evidence will bear out." (*Id.* at 13.)

### "Fraud"

49. Given the serious constitutional questions raised by the Nebraska attorney general regarding the so-called "30–day rule," defense counsel agreed Defendant was making no claim that Plaintiffs had acted "in bad faith" when they violated the challenged law. (*Id.* at 167.)

50. Defense counsel also conceded the asserted compelling interest of the State of Nebraska regarding fraud prevention, (*id.* at 13), did not relate to attempts by petition circulators to evade the suspect registration requirement; rather, the fraud-prevention interest asserted to be compelling was the interest in "assur[ing] that the signatures of registered voters in Nebraska on those peti-

---

8. Bernbeck also served on the task force and testified he had supported the 30–day rule in 1994 as a "horse trade." (*Id.* at 159–60.)

tions are, in fact, true" signatures. (2 Tr. 350.)

51. I find the evidence produced by Defendant regarding the actions of the petition circulators and others in evading or breaking the challenged circulation-registration requirement is generally irrelevant to the issue of whether the registration requirement serves the compelling governmental interest of preventing petition signature fraud. In other words, the fact that Plaintiffs or someone else violated the registration requirement for circulators does not make it more or less likely the petition signatures were fraudulently obtained. With this clarification, it is possible to focus upon the factual basis (or lack thereof) for the signature-fraud-prevention argument asserted by Defendant.

52. There was slight evidence of signature fraud in the petition process both before and after the adoption of L.B. 337. However, there was no credible evidence that circulators who were not registered voters or not registered voters for one month were more likely to obtain fraudulent petition signatures than petition circulators who were lawfully registered to vote for more than one month.

53. Hansen, election commissioner for the second most populous county in Nebraska, testified she was aware of one case of petition signature fraud in 1994 before the passage of L.B. 337. (1 Tr. 188–189.) Hansen also testified she suspected signature fraud in 1994 with regard to paid petition circulators who were not Nebraska residents, but "there's nothing we can do" because "they're gone." (*Id.* at 200.) Hansen did not quantify her suspicions or otherwise explain them. Hansen also stated she suspected some cases of fraud in the current petition-drive cycle and had referred those cases for investigation by police. (*Id.* at 181–82.) Nothing has "come to fruition yet on those investigations." (*Id.* at 182.) Hansen did not quantify the suspected fraud for the 1996 cycle or ascribe responsibility for it. (*Id.*) Hansen further testified that during this petition-drive cycle she took "several" calls from someone inquiring as to whether a circulator had been registered to vote for 30 days, but such calls were "mostly from the petition companies inquir-

ing if the people they were going to hire had been registered." (*Id.* at 185–186.)

54. In sum, out of approximately 120,000 signatures verified during petition-drive cycles, (*id.* at 199), Hansen's office was able to confirm one case of petition signature fraud in 1994 before the passage of L.B. 337. (*Id.* at 188–89; 193–94.) And in a surprising response to a question from defense counsel, Hansen confirmed she was "comfortable" that her office "was catching everything." (*Id.* at 199.)

55. Police officer Edward Sexton testified about the 1994 investigation he conducted at Hansen's request. (*Id.* at 222–28.)

56. Sexton investigated "some irregularities in the signatures" on a petition because "[t]hey didn't look like they compared to the signatures that the Election Commission had on voter registrations cards." (*Id.* at 223–24.) Sexton contacted the purported signers and learned they had not in fact signed the petitions. (*Id.* at 224.)

57. Sexton suspected four individuals. (*Id.* at 223.) Of the four suspects, two gave a Lincoln, Nebraska motel as an address on voter-registration cards. (*Id.* at 224–25.) A third suspect gave two residence addresses in Lincoln, Nebraska, one that could not be "verified" and another that had been used by the suspect for only one day. (*Id.* at 225–26.) The fourth suspect gave a Lincoln, Nebraska, address "verified" by Sexton. (*Id.* at 227.)

58. Although he tried to interview all four, Sexton was able to interview only the individual with a "verified" address. (*Id.* at 224–27.) Two other suspects could not be located. (*Id.* at 224–25.) When located, the fourth suspect made and failed to keep an appointment for an interview. (*Id.* at 226.)

59. Sexton testified the individual with a "verified" Nebraska address admitted to "forging a signature on the petition." (*Id.* at 227.) This person was a registered voter. (*Id.* at 229.) Although prosecuted, he was not convicted. (*Id.* at 228.)

60. Sexton also testified without elaboration that there are "other investigations ongoing." (*Id.* at 227–28.)

61. Margaret Jurgensen, election commissioner for the most populous county in Nebraska, testified for the defense. (2 Tr. 299–313.)

62. Jurgensen testified that out of 160,-000 signatures verified so far in 1996, her office had found 15 [9] purporting to be the signatures of persons believed to be dead. (*Id.* at 310–12.) Jurgensen contrasted these 1996 findings with 1994 when her office discovered no instances where it was believed the names of dead people had been fraudulently signed. (*Id.* at 310.) On cross-examination, however, Jurgensen admitted she was aware of at least one petition signature fraud conviction in 1994 that occurred in a neighboring county. (*Id.* at 317.)

63. Jurgensen also testified about allegations regarding one Kimberly Thurman who allegedly circulated the petitions marked as exhibits 129–137. (*Id.* at 303.) It came to Jurgensen's attention that Ms. Thurman might not have been the person who actually circulated the petitions despite the fact that her signature is purportedly on them. (*Id.* at 304–05.) One of the petitions contained the purported signature of a person Jurgensen believed was dead. (*Id.* at 302.) Thurman had been a registered voter since February 7, 1994. (*Id.* at 313.)

64. Kimberly Thurman was subpoenaed to testify by the defense, and appeared with her court-appointed lawyer. Thurman identified herself and testified that she lived at 604 South 22nd Street, Omaha, Nebraska. (*Id.* at 295.) That is a different address than was listed on the petition-circulator affidavits contained on exhibits 129–137 purportedly bearing her signature. Upon the advice of counsel, Thurman invoked her Fifth Amendment privilege against self-incrimination as to any further questions, and the court sustained her claim of privilege. (*Id.* at 296.)

65. Teresa Pyle was called to testify by the defense. (1 Tr. 229–66.) Pyle is a Nebraska resident living in Verdon, Nebraska, although she came to reside in Nebraska most recently in June, 1996. (*Id.* at 229–31.)

66. Although Pyle graduated from college in California, she was familiar with Nebraska because her father came from Nebraska and she had various relatives who lived in Nebraska. (*Id.* at 230–31.) Pyle began circulating petitions for pay in California, but she came to Nebraska in June, 1996, when a contractor with United States Term Limits offered her a job. (*Id.* at 233.)

67. Pyle came to Nebraska with another paid petition circulator by the name of Rhonda Munday. (*Id.* at 235.) Both were picked up at the airport by Betty Cowart. (*Id.* at 236.) With the aid of a registered voter who was a paid circulator, Pyle and Munday began circulating petitions in Omaha, Nebraska, the day after they arrived in the state. (*Id.* at 238–239.)

68. Approximately two days after Pyle's arrival in Nebraska, Betty Cowart instructed her to register to vote, gave her an address to use for registration, and informed her "that those are her friends and we would be staying there." (*Id.* at 246–48.) Thereafter, Pyle and Munday registered to vote in Omaha, Nebraska, using the address given them by Cowart. (*Id.* at 252.) When Pyle gave the address on the registration form, it was her intention to live there "temporarily anyway." (*Id.* at 252–53.)

69. However, Pyle did not stay at the address she listed on her registration card because the same day she registered to vote, Cowart told her the assignment had been changed and she was to go to southern Nebraska to circulate petitions. (*Id.* at 255.) Pyle went to southern Nebraska and circulated petitions, but had some type of dispute with "bad company." (*Id.* at 256.) As a consequence, Pyle moved to Richardson County, Nebraska, where her relatives were, and continued to circulate petitions. (*Id.*)

70. On July 3, 1996, Pyle returned to Omaha, Nebraska, to deliver her petitions. (*Id.* at 258–261.) Pyle claims Bernbeck notarized her petitions without actually seeing her sign them. (*Id.* at 259–61.) Pyle also claims she asked Cowart about the propriety of using the Omaha, Nebraska, address for registration purposes and Cowart told her, "Oh, don't worry about that. That's in court." (*Id.* at 261.) Pyle is presently regis-

---

**9.** This amounts to .00009375 percent of 160,000.

tered to vote in Richardson County, Nebraska. (*Id.* at 266.)

71. On cross-examination, Pyle stated that none of the signatures she collected in California or Nebraska had been forged; that she gave her correct former California address on her Omaha, Nebraska, registration card; that at the time she registered she believed the Omaha address she used was correct; and that she left for southern Nebraska the same day she registered in Omaha, but before she had an opportunity to go to the Omaha address, because Cowart told her there had been a change in plans. (*Id.* at 267–69.)[10] Pyle stated she did not believe she committed fraud when she used the Omaha address. (*Id.* at 272.)

72. Pyle admitted that before the trial of this case she wrote a letter to one of the managers of a petition-circulation company telling the manager she "wanted to talk to him first before [I] took this matter to the State of Nebraska and the press." (*Id.* at 273; Pls.' Ex 4.) Pyle claimed the company owed her money, and the "main intent" of her letter was to complain that she had not been paid what she thought she was owed for circulating petitions. (*Id.* at 273.) Pyle also wrote one of the organizers of a petition drive threatening suit if she was not paid. In that letter she stated, "Please Respond Before I take the matter to the Sec. of State." (*Id.* at 274–75; Ex. 5.)

73. When called in rebuttal, Kent Bernbeck specifically denied Pyle's allegations regarding his activities as a notary public. (2 Tr. 321–25.) He said he specifically remembered Pyle from a conversation he had with her earlier. (*Id.* at 322.) Bernbeck stated he always followed the same procedure when notarizing affidavits, (*id.* at 323–24), and recited the method he used as a matter of practice. (*Id.*) Bernbeck stated he always saw the circulator sign the affidavit before he notarized the document, and specifically testified that he saw Pyle sign her affidavits before notarizing them. (*Id.* at 324–25.) Be-

tween Pyle and Bernbeck, I found Bernbeck the more credible witness.

74. Plaintiffs called David Morris, a petition-drive consultant and manager from Washington, D.C., with 20 years' experience in 50 petition drives in 25 different states. (1 Tr. 52–65.) Morris worked for pay on a Nebraska petition drive in 1994, and consulted without pay on a Nebraska petition drive in 1996. (*Id.* at 65–66.) Morris testified that he managed circulators who were paid professionals as well as "local" circulators. (*Id.* at 57.) Morris explained there are professional circulators throughout the United States who make their livelihood "circulating petitions ... anywhere...." (*Id.*) Some professional circulators will circulate any type of petition, but others "are particular." (*Id.*)

75. Morris made it a habit to examine each and every signature on each and every petition collected when he was the manager, (*id.* at 55–56), and in this connection had examined approximately 2.5 million signatures. (*Id.*) Morris testified that in his experience "[a]nywhere between 1 and 2 percent of every drive will have obvious forgeries." (*Id.* at 58.) Morris testified he had received petitions from "local circulators" that he believed "were forged or appeared to be forged," but "I've never had a professional petitioner hand me obvious forged signatures, not one." (*Id.* at 60.)

**Narrowly Tailored Alternatives**

76. The testimony clearly established that if the Nebraska legislature wished to regulate petition drives to prevent signature fraud, there were much more narrowly tailored and less restrictive alternatives available than requiring voter registration and a one-month waiting period.

77. For example, if the legislature was concerned about having an address for petition circulators so that circulators could be contacted later in the event of a question, Hansen admitted election commissioners could be authorized to demand and acquire address information from circulators under

---

10. Under Nebraska law, petition circulators may collect petitions outside the county of their registration by filing a document with the Nebraska secretary of state. (Def.'s Ex. A at 18–19.)

There is no requirement for becoming "a cross-county circulator" except that the circulator must be a registered voter for one month. (*Id.*)

oath in the same way they presently acquire sworn address information from registered voters. (*Id.* at 186–188.) Such a data-gathering measure could be accomplished without requiring voter registration. (*Id.*)

78. Moreover, insofar as signature fraud is concerned, it is presently a crime to forge a petition signature;[11] the Nebraska legislature presently has in place a signature-verification requirement for each and every signature; and according to the election commissioner from the second most populous county in Nebraska, she is "comfortable" that her office "was catching everything." (*Id.* at 199.)

### The "Uneven Playing Field"

79. Nebraska's voter-registration and 30-day requirements for petition circulators are substantially more onerous for Nebraskans desiring political change than the regulatory requirements imposed upon other Nebraskans, also interested in politics, regarding paid or unpaid purveyors of political speech. Two examples from the trial will illustrate this point, although countless other examples could be cited.

80. People paid to lobby Nebraska legislators are not required to be registered voters or residents of the State of Nebraska. (*Id.* at 220.) Thus, a group of serious-minded Nebraskans who desire to amend Nebraska's constitution by having the legislature place an amendment on the ballot [12] may hire and pay a lawyer from Washington, D.C., who is neither registered to vote in Nebraska nor a resident of Nebraska, to accomplish that task. However, an equally serious-minded Nebraska group seeking precisely the same relief, albeit it through the petition process, could not hire and pay an unemployed single mother from Columbus, Nebraska, to circulate petitions to put an amendment on the ballot unless she was registered to vote and had been registered to vote for one month.

81. Moreover, while Nebraska petition-drive supporters cannot use circulators who

are not registered to vote, or registered voters who have been registered for less than one month, the Nebraska secretary of state admitted Nebraska law permits Nebraska petition-drive opponents to use nonvoters (from anywhere) to oppose such drives with no regulation whatsoever. (2 Tr. 351.)

### II.

With the exception of Betty Cowart's claims, I have determined that this court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983. I have further determined that the court has personal jurisdiction over all the parties.

I therefore turn to the principal legal issues raised by this case.

### A. First Amendment

Plaintiffs argue that both the statutory voter registration requirement and the associated statutory 30–day waiting requirement for initiative petition circulators violate their First Amendment right to freedom of speech. With the exception of Betty Cowart, I agree.

#### 1. The Principles

As a starting point, I shall examine the principles set forth in a closely analogous case decided by the United States Supreme Court that I believe dictates the First Amendment analysis required here. I shall then address defense efforts to avoid or distinguish the precedent.

##### a.

In *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), the Supreme Court unanimously struck down a Colorado statute that made it a crime to pay or receive money for circulating initiative petitions. The initiative petition at issue in *Meyer* sought to change the Colorado constitution by removing motor carriers from the jurisdiction of a regulatory body. *Id.* at 417, 108 S.Ct. at 1889–90. In voiding the Colorado statute, the Supreme Court articulated the following principles I believe applicable to this case.

---

11. Neb.Rev.Stat. § 32–1546(1), cl. 2 (Michie 1995) ("Any person … who signs any name other than his or her own to any petition … shall be guilty of a Class I misdemeanor.")

12. Nebraska's legislature may propose amendments to the state constitution. Neb. Const. art. XVI, § 1.

■ First, a state statutory limitation on the circulation of initiative petitions that reduces "the available pool of circulators"[13] for hire "involves a limitation on political expression subject to exacting scrutiny" under the First Amendment that is made applicable to the states by the Fourteenth Amendment. *Id.* at 420, 108 S.Ct. at 1891.

■ Second, the efforts of initiative-petition-drive organizers to "petition to achieve political change" implicate the federal constitutional right "freely to engage in discussions concerning the need for that change" that is in turn "guarded by the First Amendment." *Meyer*, 486 U.S. at 421, 108 S.Ct. at 1891. This is true because circulating initiative petitions "involves both the expression of a desire for political change and a discussion of the merits of the proposed change" even though "a petition circulator may not have to persuade potential signatories that a particular proposal should prevail to capture their signatures." *Id.* Indeed, in "almost every case" the circulator must give an "explanation of the nature of the proposal and why its advocates support it." *Id.* Therefore, the "circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22, 108 S.Ct. at 1892.

■ Third, a statutory restriction regarding initiative petition circulators that reduces the "available pool of circulators" for hire "restricts political expression in two ways": (1) "it limits the number of voices who will convey [the organizer's] message and the hours they can speak and, therefore, limits the size of the audience," and (2) "it makes it less likely that [the organizers] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 422–23, 108 S.Ct. at 1892.

■ Fourth, the fact that residents of a state have other means to express their views as part of the initiative process does not make statutory restrictions limiting the pool of circulators available for hire constitutionally acceptable because (1) the use of "paid petition circulators" appears to be "the most effective, fundamental, and perhaps economical avenue of political discourse" in that it involves "direct one-on-one communication," *id.* at 424, 108 S.Ct. at 1893, and (2) because the "First Amendment protects [the organizers'] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.*

■ Fifth, statutory restrictions limiting the pool of initiative petition circulators available for hire are not "justified by [a State's] interest in making sure that an initiative has sufficient grass-roots support to be placed on the ballot" because this interest "is adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." *Id.* at 425–26, 108 S.Ct. at 1894.

■ Sixth, in order to justify the reduction of the available pool of initiative petition circulators because of a state's asserted "interest in protecting the integrity of the initiative process," the state must "demonstrate that it is necessary to burden [the organizers'] ability to communicate their message in order to meet its concerns." *Id.* at 426, 108 S.Ct. at 1894. Two points should be emphasized regarding the state's burden:

■ 1. Courts will not accept the assumption "that a professional circulator—whose qualification for similar future assignments may well depend on a reputation for competence and integrity—is any more likely to accept false signatures than a volunteer who is motivated entirely by an interest in having the proposition placed on the ballot." *Id.* Thus, speculative assertions that paid circulators are more likely to engage in fraud than unpaid circulators are unacceptable. Similarly, speculative assertions that paid circulators from other states are more likely to

---

**13.** Reduction in the "available pool of circulators" was Justice Stevens's description of the unconstitutional impact found to exist by the court of appeals decision affirmed in *Meyer.* 486 U.S. at 419, 108 S.Ct. at 1890.

engage in fraud will be rejected in the absence of proof.

■ 2. When other provisions of the law exist to prevent signature fraud such as criminal statutes prohibiting forgery or statutes requiring warnings on petitions, "[t]hese provisions" will be deemed "adequate to the task of minimizing the risk of improper conduct in the circulation of a petition" unless the state presents evidence to overcome the apparent adequacy of these alternatives. *Id.* at 426–28, 108 S.Ct. at 1894–95.

■ Seventh, the fact that the right of initiative may be "a state-created right" does not mean a state legislature "is free to impose limitations on the exercise of that right." *Id.* at 424–25, 108 S.Ct. at 1893. This is particularly true where the "statute trenches upon an area in which the importance of First Amendment protections is 'at its zenith'" as is the case with statutory restrictions that limit the pool of available circulators. *Id.* at 425, 108 S.Ct. at 1894.

#### b.

■ For obvious reasons, able defense counsel[14] struggles mightily to avoid the clear import of *Meyer v. Grant* by endeavoring to convince me either to ignore the decision because it is wrong or distinguish that case from this one. Moore has reason to fear *Meyer* because "it is the rare case" that involves a statute capable of surviving the type of "strict scrutiny" required by *Meyer*. *Burson v. Freeman*, 504 U.S. 191, 210, 112 S.Ct. 1846, 1857, 119 L.Ed.2d 5 (1992). In any event, I am not persuaded by Moore's effort to avoid or distinguish *Meyer*.

To begin with, the defense indirectly argues that *Meyer v. Grant* was wrongly decided because at issue in that case (and this one) was not speech protected by the First Amendment but conduct the state reasonably sought to regulate; therefore, I should not follow the Court's decision in this case.

Rather, Defendant argues that I ought to follow a law review article by two scholars who believe *Meyer v. Grant* was wrongly decided because, as Moore put it in his brief, statutory restrictions that limit the pool of available circulators "regulate process and not speech." (Def.'s Pretrial Br. at 5–6 (quoting Daniel Hays Lowenstein & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and a Proposal*, 17 Hastings Const. L.Q. 175 (1989)) [hereinafter *A Dissenting View* ].)

In their law review article highly critical of *Meyer*,[15] the authors describe a situation in which they say no speech is prohibited. They present a hypothetical statute that directs an election official not to count the signatures collected by paid petition circulators. *A Dissenting View*, 17 Hastings Const. L.Q. at 185. The authors assert such a statute does not involve restrictions on speech, and Moore argues the hypothetical statute discussed by the law professors is the case here.

■ I am not persuaded by this argument for two related reasons. First, I am not writing a law review article. Rather, I am required to apply in good faith the precedent of the United States Supreme Court whether I agree with that precedent or not. *See, e.g., Dronenburg v. Zech*, 741 F.2d 1388,

---

**14.** All the lawyers in this and the related case treated each other, the witnesses, and the court with exemplary civility and professionalism. In particular, defense counsel in this case, who was specially engaged to represent Mr. Moore on very short notice because of the disqualification of the attorney general, performed with admirable dedication and zeal under trying circumstances while displaying complete professionalism.

**15.** There is frequently a political undercurrent to legislation that restricts the power of initiative and referendum despite the "good government" rhetoric of authors like Lowenstein and Stern

who propose such measures. The right to initiative and referendum has the potential to threaten those who control the established political branches of state government. The so-called "term-limits" movement is but one example. Consequently, it is appropriate to take critics of *Meyer* such as Lowenstein and Stern with a grain of salt. In any event, the resolution of the tension between the established political branches of state government, like the legislature, and proponents of a robust initiative process, like these plaintiffs, is entirely a matter for the Nebraska political process, assuming, of course, the Constitution is not trampled in that process.

1396 n. 5 (D.C.Cir.1984) (Bork, J.). Moreover, when I apply *Meyer* to the hypothetical statute proposed by the law professors (which Defendant argues is the case here), I can find no distinction that makes a difference (nor can the authors).

Lowenstein and Stern admit "it would be awkward for" a court to "uphold the hypothetical statute" because "there is almost no difference between what is forbidden under the" hypothetical statute and the statute considered in *Meyer*. *Id.* at 185. If there is no difference (and I agree there is none), it follows that there is no good-faith basis upon which to distinguish *Meyer* from this case. Accordingly, while law professors might be free to propose a "dissent" to *Meyer v. Grant*, I am not at liberty to do so. *Meyer*, when objectively read, applies to this case; I must therefore follow it.

Next, the defense asserts that Nebraska does not make criminal the circulation of petitions by persons who are not registered to vote nor the circulation of petitions by persons who are not registered to vote for 30 days, thus suggesting that because *Meyer* involved a criminal statute and this case does not, *Meyer* can be distinguished by a judge inclined to do so.

Once again I am not persuaded. First of all, the premise of defense counsel's argument is incorrect. Nebraska does in fact make it a crime for a person who is not registered to vote or who has not been registered to vote for 30 days to circulate a petition. Neb.Rev.Stat. § 32–1546(1) (Michie 1995).[16] *See also* Neb.Rev.Stat. §§ 32–629 to 32–630(3)(c) (Michie 1995).

More to the point, *Meyer* did not turn on the fact that Colorado enforced its prohibition by criminal statute. Indeed, in another election-process strict-scrutiny case, the Supreme Court itself described *Meyer* as involving an "absolute bar against the use of paid circulators" and attached no significance to the fact that the bar flowed from a criminal statute. *Burson v. Freeman*, 504 U.S. at 210, 112 S.Ct. at 1857. Lower federal courts

have consistently applied *Meyer* in cases where only civil statutes were involved. *See, e.g., Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir.1993) (applying *Meyer* to Michigan civil statutes dealing with such things as requiring warnings on petitions, but holding that the statutes survived constitutional scrutiny); *American Const. L. Found., Inc. v. Meyer*, 870 F.Supp. 995, 1001–02 (D.Colo.1994) (applying *Meyer* and declaring unconstitutional Colorado civil statute requiring circulators to wear identification badges). Thus, whether or not this case involves an effort by the Nebraska legislature to enforce its restrictions through a criminal statute does not determine whether *Meyer* applies.

Still further, the defense asserts this case is categorically different from *Meyer* because here the restriction requires voter registration for circulators, whereas the restriction in *Meyer* banned paid circulators altogether. I do not believe this distinction is relevant.

As in *Meyer*, the restriction at issue here, no matter how characterized, impedes free speech by lessening the "available pool of circulators" who can be used by other people to get their message out. *Meyer*, 486 U.S. at 419, 108 S.Ct. at 1890. In both this case and *Meyer*, the "available pool of circulators" was dramatically reduced by the restrictions; hence, I can find no categorical difference between the two cases that would free me from the analytical requirements of *Meyer*.

Indeed, the authors of *A Dissenting View*, the law review article upon which Moore relies so heavily, make this precise point: "The only serious justification for restricting petition-circulation to registered or eligible voters is that the ability to recruit circulators is the measure of voter support. This is precisely the justification for a ban on paid circulators." *Id.*, 17 Hastings Const. L.Q. at 214–15 & n. 160. And, as the professors gloomily recognize, "[i]f saying that one individual may not be paid to circulate a petition infringes freedom of speech, saying that another individual may not circulate a petition

---

**16.** During subsequent oral argument via telephone, Nebraska's attorney general agreed that section 32–1546(1) makes criminal the circulation of initiative petitions by nonvoters and regis-

tered voters who have been registered for less than one month. (Tel.Tr. of 8/12/96, at 5–6.) Counsel for Moore candidly admitted, "I can't disagree." (*Id.* at 5.)

at all must violate the First Amendment even more." *Id.* at 214.

Finally, I wish to explain what might distinguish this case from *Meyer* in order to clarify what is *not* at issue here. If Nebraska's constitution defined the right to circulate petitions by granting that right only to persons who were registered voters or registered voters for one month, it is at least arguable that *Meyer* would not apply. *See American Const. L. Found., Inc.,* 870 F.Supp. at 999, 1002 (holding *Meyer* did not apply where an amendment to Colorado's constitution, ironically initiated by petition and approved by the Colorado electorate, imposed the requirement that only registered voters could circulate petitions).

It might be argued *Meyer* would not apply in such a situation because *Meyer* assumed (without deciding) that the State of Colorado was free to define the right to the initiative process as it saw fit. *Meyer,* 486 U.S. at 424, 108 S.Ct. at 1893. *Meyer* then proceeded to hold that once the right of initiative had been defined, as in Colorado's constitution, a political branch of government, like the Colorado legislature, could not statutorily limit the manner in which that right was exercised by infringing upon the federal constitutional right to free speech. *Id.* at 425, 108 S.Ct. at 1894.

As noted in part I of this opinion, Nebraska's constitution contains no voter-registration or residency restrictions with regard to who may circulate petitions. Moore has admitted this point. Moreover, as also observed in part I, Nebraska's constitution is expressly "self-executing" insofar as the initiative process is concerned and provides that the Nebraska legislature has the power only to "facilitate," not limit, that right.

Nebraska's attorney general convincingly makes the latter point in his friend-of-the-court brief. As he points out, in commenting on the unconstitutionality of L.B. 337,[17] the attorney general warned the Nebraska legislature that it "may only make laws which facilitate the initiative process." (Att'y Gen.'s Br. & attached Op. Att'y Gen. 95031, at 6–7.) The attorney general understood Nebraska law to mean that the legislature could only make laws regarding the initiative process which made that process "easy" or "less difficult" from the perspective of "individual citizens." (*Id.* at 7–8.)

In this regard, the attorney general further advised the legislature that the Nebraska Supreme Court had held that because of the "self-executing" nature of the initiative-and-referendum provisions of Nebraska's constitution, " '[a]ny legislation which would hamper or render ineffective the power reserved to the people would be unconstitutional.' " (*Id.* at 6–7 (quoting *State ex rel. Ayres v. Amsberry,* 104 Neb. 273, 276–77, 177 N.W. 179, 180 (1920), *vacated on unrelated jurisdictional grounds,* 104 Neb. 273, 178 N.W. 822 (1920)).)

Consequently, Moore cannot distinguish *Meyer* on grounds that the Nebraska legislature has the power under state law to define, reduce, or limit the state constitutional right to circulate petitions. Therefore, since Nebraska's constitution imposes neither a residency nor a registration requirement for the circulation of petitions, this court is obligated under *Meyer* to strictly scrutinize the statutorily "impose[d] limitations on the scope of the state-created right to legislate by initiative" to the extent those restrictions "limit discussion of political issues raised in initiative petitions." *Meyer,* 486 U.S. at 424–25, 108 S.Ct. at 1893.

In short, I am unconvinced by defense efforts to avoid or distinguish *Meyer.*

### 2. The Principles Applied

Having concluded that *Meyer* cannot honestly be distinguished from this case, I must determine whether the statutory voter-regis-

---

17. The attorney general did not believe the voter registration requirement, as opposed to the 30–day registration requirement, violated the state or federal constitution. He reached this conclusion because he believed there was a compelling governmental interest in such a requirement in order to prevent fraud. While I agree with the attorney general that fraud prevention is a compelling governmental interest, as will be discussed later in the text, I do not agree that the voter-registration requirement is sufficiently narrowly tailored to survive federal constitutional scrutiny. It should be noted that the attorney general did not support the voter-registration requirement when he appeared before me in this case.

tration requirement and related 30–day restriction on Nebraska's otherwise unlimited constitutional right to circulate petitions "reduce[ ] the available pool of circulators" for hire such that core political expression protected by the First Amendment is adversely impacted. If so, I must then apply exacting scrutiny to the challenged restrictions.

### a.

 As in *Meyer*, I find and conclude that the statutory voter-registration and related 30–day–waiting–period restrictions on petition circulators reduce the "available pool of circulators," 486 U.S. at 419, 108 S.Ct. at 1890, and "restrict political expression in two ways." *Id.* at 422–23, 108 S.Ct. at 1892.

First, the restrictions "limit[ ] the number of voices who will convey [the organizer's] message and the hours they can speak and, therefore, limit[ ] the size of the audience." *Id.* at 422–23, 108 S.Ct. at 1892. The evidence is undisputed that when petition organizers attempted to comply with the restrictions, the number of individuals they could hire to solicit signatures was grossly insufficient to the task, and this was true despite efforts to obtain "qualified" circulators through mass mailing and advertisements.

For example, by ignoring the voter-registration and 30–day–waiting–period restrictions, Bernbeck's group was able to increase its petition circulators from 216 to approximately 700 in about 45 days. Likewise, when Bellino's group decided to ignore the restrictions, its circulators increased from 130 to approximately 440. As a factual matter, there is no doubt the challenged restrictions dramatically reduce the number of circulators who can be hired or recruited as volunteers to spread the message of the various petition-drive organizers.

Second, the restrictions "make[ ] it less likely that [the organizers] will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id.* at 423, 108 S.Ct. at 1892–93. The evidence establishes that Bernbeck's group, Dobrovolny's group, and Bellino's group would not have collected anywhere near enough signatures to put their amend-

ments on the ballot had they complied with the restrictions.

Bernbeck's group ultimately turned in 159,000 signatures, but the group was about 130,000 signatures short of this mark when they decided to ignore the restrictions a month before the deadline. Likewise, with only 10 days left, Dobrovolny's group was able to increase its signatures from 90,000 (about 8,000 short of the minimum) to approximately 108,000 (about 10,000 more than the minimum) by violating the restrictions. Bellino's group turned in 133,000 signatures, 113,000 of them collected less than a month before the deadline but only after the restrictions were violated.

 Finally, to the extent Moore seriously argues as a factual matter that the activities of the circulators do not involve "core political speech," I reject the argument. The record overwhelmingly proves otherwise.

For example, Kutschkau testified that (1) she supports all the petitions she circulated; (2) she intends to vote for the amendments if they reach the ballot; (3) she read the petitions and received a briefing on them before circulating them; and (4) she always explained the petitions fully to potential signatories because, among other things, she was afraid of being prosecuted for a crime if she misled anyone. As a matter of state law, a petition circulator *must* inform each potential signer of the purpose of a petition before the person signs the petition. *See* Neb.Rev.Stat. § 32–628(3) (Michie 1995).

The record thus supports the *Meyer* conclusion that in "almost every case" the circulator must give an "explanation of the nature of the proposal and why its advocates support it." *Id.* at 421, 108 S.Ct. at 1892. In this case, as in *Meyer*, the "circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22, 108 S.Ct. at 1892.

### b.

 Since "core political speech" is adversely impacted by the challenged restrictions, I must apply "strict" or "exacting" scrutiny to those restrictions. *Id.* at 420, 108 S.Ct. at 1891. "Exacting or strict scrutiny"

means "[t]he State must show that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Burson v. Freeman,* 504 U.S. at 198, 112 S.Ct. at 1851 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983)). *See also Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976).

■ It is the "rare case in which [the Supreme Court has] held that a law survives strict scrutiny." *Burson,* 504 U.S. at 211, 112 S.Ct. at 1857. This is because a governmental restriction on the exercise of the right to free speech is justified only:

if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the government interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

■ As *Burson* makes clear, the *defendant* bears the burden of proof. *Burson,* 504 U.S. at 198, 112 S.Ct. at 1851. In cases where there is a conflict between First Amendment rights and a state election process, the Supreme Court has expressed the "burden of proof" in two ways, depending upon whether the speech threatens or does not threaten "the act of voting itself."

■ If the speech at issue threatens "to interfere with the act of voting itself," the state is not required to produce "empirical evidence" that the precise restriction is necessary, although the burden of proof is otherwise the same. *Id.* at 208–09 n. 11, 112 S.Ct. at 1856–57 n. 11 (ban on campaign activity within 100 feet of polling place was narrowly tailored to serve compelling state interest in preventing voter intimidation and election fraud without proof that 100–foot boundary was the exact distance required to accomplish the compelling governmental interest) (plurality op.). On the other hand, if the speech does not threaten "to interfere with

the act of voting itself," then "[s]tates must come forward with more specific findings to support the regulations directed at intangible 'influence'. . . ." *Id.* at n. 11.

I next determine whether Moore has shown the restrictions are necessary to serve a compelling governmental interest and whether they are narrowly drawn to achieve that end.

### i. Circulators Must Be Registered Voters

Moore asserts two grounds for saving the voter-registration restriction: "maintenance of the integrity of the initiative process" and prevention of signature fraud. I turn to those claims now.

### Integrity of Initiative Process

By "maintenance of the integrity of the initiative process," Moore opines that the process "is reserved for Nebraskans, people who live in Nebraska, make their livelihood here, will continue to live here." Thus, Moore argues that voter-registration requirements for petition circulators are perfectly sensible.

■ In contrast, I find and conclude that Moore's asserted governmental interest is not compelling, and even assuming that reserving the initiative process to Nebraskans constitutes a compelling governmental interest, the voter-registration requirement for circulators is not narrowly tailored to achieve the governmental end.

The difficulty with the assertion that the initiative process is "reserved for Nebraskans" is that the statement is far too broad and simply wrong insofar as petition circulators are concerned. When questioned by the court, Moore's counsel admitted as much at trial:

THE COURT: Just so we're clear, the Nebraska Constitution does not provide residency requirements for petition circulators and it does not require petition circulators to be registered voters?

COUNSEL FOR DEFENDANT: No.

(1 Tr. 20:15–19.)

While Nebraska law gives the right to *sign* petitions to those who are registered to vote

(at the time the petitions are turned in) and that restriction is not challenged here, Nebraska's constitution gives the right to *circulate* petitions to the "people," without any limitation on whether they are registered to vote or residents of Nebraska. Neb. Const. art. III, §§ 1, 2, 4.

Thus, there is no "compelling governmental interest" in preventing someone like Dobrovolny, a rancher from remote Atkinson, Nebraska, from hiring nonvoters (wherever their residence) to help him circulate petitions. The asserted governmental interest is not "compelling" because Nebraska's "self-executing" constitution imposes no such limitation on Nebraskans like Dobrovolny or petition circulators in general. And, as indicated earlier, the Nebraska legislature has no legitimate power to limit the state constitutional right to the initiative process.

■ Even if Nebraska's petition process is *generally* reserved for Nebraskans because voters sign the petitions and ultimately vote on the amendments that reach the ballot and the Nebraska legislature might therefore have a compelling interest in preserving the initiative process for Nebraskans, the *specific* voter-registration requirement for circulators harms the very Nebraskans it is ostensibly designed to protect. The restriction is not narrowly tailored to serve the goal of preserving the initiative process for Nebraskans. I turn to this point next.

Circulating a petition is much more like political campaigning than it is voting for two reasons. First, a circulator must persuade a Nebraskan to place his or her signature on a petition, and even if the Nebraskan places his or her signature on the petition, that signature is not counted for any purpose until an impartial election commissioner verifies the signature and determines the signer is a registered voter. Second, the intent of the petition circulator is to persuade the signer that the measure is worthy of later consideration at the polls, and the signer knows that he or she may sign a petition yet vote against the measure when it comes time to cast a ballot. Thus, what petition circulators primarily do is promote discussion of political issues by and among Nebraskans.

In no other case are Nebraskans who advocate or oppose electoral measures prohibited from hiring or recruiting people to help get their message out merely because a prospective worker or volunteer is not registered to vote. Three examples illustrate this point.

Nebraska law *does not prohibit a Nebraskan* from hiring a lobbyist from Washington, D.C., who is not registered to vote, to lobby the Nebraska legislature to place a constitutional amendment on the ballot. *See, e.g.,* Neb.Rev.Stat. § 49–1480 (Michie 1995). Nebraska law *does not prohibit a Nebraskan* running for elective office from hiring a campaign manager from St. Louis, Missouri, or recruiting campaign volunteers from a college in Kansas, who are not registered to vote, to help him or her get elected. *See, e.g.,* Election Act, Neb.Rev.Stat. §§ 32–101 to 32–1550 (Michie 1995); Campaign Finance Limitation Act, Neb.Rev.Stat. §§ 32–1601 to 32–1611 (Michie 1995); Nebraska Political Accountability and Disclosure Act, Neb.Rev. Stat. §§ 49–1401 to 49–14,140 (Michie 1995). Nebraska law *does not prohibit a Nebraska pro-union or pro-business group* from using its members who are Nebraska residents but nonvoters to run a telephone bank to oppose the initiatives proposed by other Nebraskans. *Id.* In each of these situations only Nebraskans are ultimately entitled to vote, but Nebraska law permits *Nebraskans, except for initiative proponents,* to hire or recruit nonvoters (no matter their residence) to "get out the vote" *favored by the Nebraskans* employing or recruiting the nonvoters.

Why does Nebraska law generally permit nonvoters to work on political campaigns if only registered voters can ultimately cast a ballot? The answer is simple and obvious. Campaign workers are a "means" to an "end." The "end" is electoral success, and the "means" or "tools," such as campaign workers, permit *Nebraskans* to achieve electoral success by convincing other *Nebraskans* of the potency of their cause.

Just as it would be fallacious to require term-limits supporters to circulate their petitions on paper manufactured in Nebraska for the ostensible purpose of preserving the initiative process for Nebraskans, it is equally

fallacious to require term-limits supporters to circulate petitions using registered voters in order to preserve the initiative process for Nebraskans. Both the paper on which the petitions are printed and the circulators who solicit the signatures on the petitions are "tools" that allow one group of Nebraskans to try to persuade other Nebraskans to follow a particular political path.

As the evidence in this case conclusively establishes, the impact of restricting circulators to those who are registered to vote is that petition drives to place constitutional amendments on the ballot will fail. This ultimately means that *Nebraska voters* will not be given the choice to amend their constitution as *other Nebraska voters* propose. Such a result hardly furthers the alleged governmental interest of preserving the initiative process for Nebraskans.

If the real reason behind the registered-voter restriction is to insure "grass-roots" support for initiative measures, *Meyer* answers the question of whether a voter-registration requirement is narrowly tailored to achieve that end. As *Meyer* points out, this interest—grass-roots support—"is adequately protected by the requirement that no initiative proposal may be placed on the ballot unless the required number of signatures has been obtained." *Meyer*, 486 U.S. at 425–26, 108 S.Ct. at 1893–94. *See* Neb. Const. art. III, § 2 (10 percent of registered voters required to sign petitions before constitutional amendment appears on ballot).

In sum, Moore's asserted governmental interest in preserving the initiative process for Nebraskans is not compelling, and even assuming that reserving the initiative process to Nebraskans constitutes a compelling governmental interest, the voter-registration requirement for circulators is not narrowly tailored to achieve that end.

### Signature Fraud Prevention

Moore argues that the voter-registration requirement serves the compelling governmental interest of preventing signature fraud. Prevention of signature fraud is indeed a compelling governmental interest. *Meyer*, 486 U.S. at 426, 108 S.Ct. at 1894. However, there is no evidence that registered voters are less likely to engage in signature fraud than nonvoters, and in any event, other provisions of Nebraska law are adequate to prevent signature fraud without imposing a voter-registration requirement.

Much of Moore's evidence was designed to convince me that nonvoters, particularly paid petition circulators from other states, are more likely to commit signature fraud than registered voters. However, not only did the evidence fail to prove that point, if anything it tended to prove that when signature fraud occurred, a registered Nebraska voter was the culprit. As a result, there is virtually no factual basis for much of Moore's argument.[18]

Moore next asserts the voter-registration requirement for circulators serves to prevent signature fraud because it requires the circulator to understand Nebraska law. I am not persuaded.

There is no reason to believe registered voters are more likely than nonvoters to understand Nebraska law regarding the circulation of petitions, or any other component of Nebraska law, no matter where the circulator resides. On the contrary, professional petition circulators, regardless of whether they are registered to vote or live in Nebraska, are more likely to understand the law than volunteers who do not make their living circulating petitions. This is true because their "qualifications for similar future assignments may well depend on a reputation for competence and integrity." *Meyer*, 486 U.S. at 426, 108 S.Ct. at 1894. The testimony of David Morris, the petition-drive consultant, was persuasive on this point.

Even if Moore's assumption had a factual basis, however, the ostensible educational function of registration is served by the warnings Nebraska requires in bold type on every petition and the fact that each petition circulator must sign an affidavit attesting to

---

18. Since this case does not involve speech that threatens "to interfere with the act of voting itself," Moore "must come forward with more specific findings to support the regulation directed at intangible 'influence'...." *Burson*, 504 U.S. at 209 n. 11, 112 S.Ct. at 1856 n. 11. But even if I assume the burden of proof should be relaxed on some strained theory that the speech here threatens to interfere with the act of voting itself, the result would be the same.

his or her awareness of pertinent Nebraska petition laws. In addition, there is, of course, nothing to stop Nebraska from imposing reasonable educational requirements on petition circulators substantially less demanding than voter registration.

In short, the Nebraska legislature does not assume that lobbyists must be registered voters in order to understand and comply with Nebraska law, and there is no reason to apply a different standard to petition circulators.

Moore also asserts the voter-registration requirement serves to prevent signature fraud because an address record is established and maintained for each circulator that can be checked in the event of suspected fraud. In this connection, Moore further asserts the voter-registration requirement provides a record other voters can check to determine whether a circulator is qualified to circulate petitions.

While these assertions may be true, there are many other substantially less burdensome methods of accumulating such information. A simple registration system for circulators is one way addresses could be maintained without requiring voter registration. Moreover, the same system could be used to provide the public with information about whether an individual is authorized to circulate a petition. Indeed, Plaintiffs' counsel skillfully forced Ms. Hansen, an election commissioner, to admit this point during cross-examination.

Finally, Moore asserts I should follow two ballot-access cases that found voter-registration requirements for petition circulators valid. *See Merritt v. Graves,* 702 F.Supp. 828 (D.Kan.1988) (voter-registration requirement for circulator of petition to put political party on ballot was constitutional); *Libertarian Party of Neb. v. Beermann,* 598 F.Supp. 57 (D.Neb.1984) (portion of statute governing formation of new political parties requiring petition circulators to be registered voters was constitutional). I decline to follow those cases for three reasons.[19]

First, the cases cited by Moore are categorically different from this case. Both cases relied upon by Moore are so-called "ballot-access" cases where a political party sought access to the ballot. Ballot-access cases are very different from cases involving initiative (or referendum) petitions where the objective is not to help one political party at the expense of another, but to change the law or propose a new law.

In both *Merritt* and *Libertarian Party,* the courts recognized it was necessary to require a circulator to be a registered voter because of the unique nature of ballot-access cases. Both courts reasoned that requiring a circulator to be a registered voter, therefore making the individual easier to identify as a past supporter of a particular political party, reduced the likelihood that a bogus circulator (a Republican party stalwart for example) would circulate a third-party petition (on behalf of the Libertarian party perhaps) in order to harm yet another party (possibly the Democrats). *Merritt,* 702 F.Supp. at 833–34; *Libertarian Party,* 598 F.Supp. at 64–65. No such concern exists with regard to initiative or referendum petitions.

Second, although it was decided shortly after *Meyer, Merritt* made no mention of the *Meyer* case, and *Libertarian Party* was decided prior to *Meyer.* As a result, neither judge had the benefit of *Meyer.*

Third, *Merritt* refused to apply "strict scrutiny," 702 F.Supp. at 835, and while it is not entirely clear what standard was applied in *Libertarian Party,* if "strict scrutiny" was used, it was a much-relaxed version of it. 598 F.Supp. at 65. As a result, neither judge applied the rigorous scrutiny *Meyer* demands.

In summary, as in *Meyer,* Nebraska has many devices for preventing signature fraud short of requiring petition circulators to be registered voters. Such devices include, but are not limited to, making signature fraud a crime, requiring that each signature be verified by election officials, requiring warnings on petitions, and requiring circulator affida-

---

19. For essentially the same reasons, I also decline to follow an unpublished opinion of the Lancaster County, Nebraska, district court. *See*

*State of Neb. ex rel. Clean Env't Comm. v. Beermann,* No. 486, at 94 (Sept. 21, 1992).

vits. Therefore, in the absence of proof to the contrary (and there is none), these "provisions seem adequate to the task of minimizing the risk of improper conduct in the circulation of a petition, especially since the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer*, 486 U.S. at 427, 108 S.Ct. at 1895.

■■■ As Lowenstein and Stern observed: [T]here is no basis for saying that an eligible voter is more reliable than a nonvoter. Aliens, for example, or persons who have moved to a state within 30 days are not less reliable as a group than registered voters. There is some convenience to election officials, who have signatures of registered voters on file, in limiting the circulators to that group. Administrative convenience, however, is not usually enough to justify what is, by hypothesis, a significant restriction of speech rights. More fundamentally, the "verification" function served by the circulator provides little benefit, especially in the great majority of states that check signatures after the petitions are filed.

Daniel Hays Lowenstein & Robert M. Stern, *A Dissenting View*, 17 Hastings Const. L.Q. at 214–15 n. 160.

### ii. Circulators Must Be Registered Voters for 30 Days

■■■ Virtually all that has been said regarding the requirement that circulators must be registered voters applies with equal force to the requirement that circulators must be registered voters for one month. I shall not reiterate those points because Moore's justifications for the registered-voter restriction are precisely the same as his justifications for the one-month waiting requirement, and my response is likewise identical. Four brief comments are appropriate, however.

First, while Moore is no doubt sincere in his defense of the one-month waiting requirement, he informed the Nebraska legislature in a candid moment that he doubted the propriety of such a restriction. Moore asked a committee of the Nebraska legislature then considering L.B. 337, "Are you a better registered voter in three months [the restriction was then three months] than you are in one day?" (Pls.' Ex. 1, at 105 (Moore Test. before Neb. Leg.'s Comm. on Gov't, Mil. & Veterans Aff. (Feb. 1, 1995)).) Answering his own question in the negative, Moore stated, "[I]f you are a registered voter, you're a registered voter. I think that's what you got to stay with." (*Id.*) Moore then suggested this restriction be removed from L.B. 337. (*Id.*)

Second, after carefully reviewing the evidence presented at trial, I agree with Nebraska's attorney general that the one-month waiting requirement "appears to be a punitive measure designed to circumvent the United States Supreme Court's decision in *Meyer*. In fact, the bill's chief proponent insisted on including a severability clause in L.B. 337 due specifically to concerns regarding the constitutionality of the 30–day waiting period." (Att'y Gen.'s Br. at 5 (citing *Floor Debate on L.B. 337*, 94th Neb.Leg., 1st Sess. (Apr. 2, 1995)).)[20] (Def.'s Ex. 122, at 2490 in this record.) ("The one part of the amendment adds a severability clause to the bill and the reason for that is that there are some that feel that by requiring petitioners to be registered to vote for one month before actually circulating petitions could be suspect.") As one state senator put it while debating L.B. 337, "[W]e have, as a legislature, for many years taken a dim view of paid petition circulators . . . ." (*Id.* at 2481.) The challenged restriction is a transparent effort to avoid the clear holding of *Meyer* by doing indirectly what the legislature cannot lawfully do directly.

Third, the evidence (as opposed to rank speculation)[21] reveals that circulators regis-

**20.** The actual date was March 13, 1995.

**21.** Without any showing that she had the foundation necessary to give a nonspeculative answer, Jurgensen was asked to express an opinion concerning why there were 15 instances of deceased voters' names appearing on petitions in this cycle when there were none in the previous cycle. It is preposterous for election officials to speculate about the causes of signature fraud until and unless they have thoroughly investigated the alleged problem. It is entirely inappropriate to guess about the causes of signature fraud based

tered to vote for less than one month take their jobs seriously and scrupulously try to avoid signature fraud. From plaintiff Kutschkau, a lifelong Nebraska resident, to defense witness Pyle, a short-term Nebraska resident who is no friend of Plaintiffs, the evidence established that petition circulators registered to vote for less than one month did not engage in signature fraud. In fact, as noted earlier, if the evidence proved anything it proved that long-time registered voters were more likely to commit signature fraud than persons hired to circulate petitions who were only recently registered to vote.

Fourth, Moore cites *Rosario v. Rockefeller*, 458 F.2d 649 (2nd Cir.1973), in support of his claim that the 30–day waiting period is constitutional. *Rosario*, which involves a requirement that voters declare their political preference at least 30 days before the general election in order to vote in a subsequent party primary, has nothing to do with the free-speech claims at issue in this case. Indeed, the *Rosario* Court used "rational-basis" scrutiny rather than "strict scrutiny" in its analysis. *Id.* at 760, 762, 767–70. *Compare also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 107 S.Ct. at 544, 93 L.Ed.2d 514 (1986) (invalidating Connecticut prohibition against independent voters participating in Republican primary when Republican party rules permitted such participation).

In conclusion, the one-month waiting period before registered voters can circulate initiative petitions does not serve a compelling governmental interest, and it is not narrowly tailored to achieve a compelling governmental interest even if there were one.

### B. Betty Cowart

Betty Cowart, the lone nonNebraska resident, asserts the same First Amendment claims as the rest of the plaintiffs. As noted earlier, Cowart also asserts additional claims relating to the "Privileges and Immunities Clause" and the "Commerce Clause." I believe all of Cowart's claims are potentially unique to her nonresident status.

upon suspected but unverified instances in .00009375 percent of the cases. This is all the more true where, as here, there is no showing regarding the specifics ("who, what, when,

▇▇ I do not reach the merits of Cowart's claims because they involve no actual case or controversy under Article III of the Constitution, and I therefore lack jurisdiction over the subject matter of her claims. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986) (citing *Marbury v. Madison*, 1 Cranch 137, 173–180, 2 L.Ed. 60 (1803)).

▇▇ As the Supreme Court said:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Bender*, 475 U.S. at 542, 106 S.Ct. at 1332 (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700) (1982) (internal citations omitted). This Cowart has failed to do.

Although Cowart is a named plaintiff, she did not appear at trial, and her deposition was not taken for use at trial. The record contains very little evidence about her. In particular, there is no evidence that Cowart was actually injured by the alleged restrictions, and there is no evidence that she will be actually injured by the restrictions in the future.

▇▇ As the United States Court of Appeals for the Eighth Circuit has stated, "The test to determine whether there is an actual controversy within the meaning of the Declaratory Judgment Act is whether 'there is a substantial controversy between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Marine Equip. Management Co. v. United States*, 4 F.3d 643, 646 (8th Cir.1993) (citations omitted). In particular, this test is not

where") of 14 of the 15 suspected cases. In the 15th case Jurgensen was investigating Thurman, a Nebraska registered voter since February 7, 1994.

satisfied if the court does not have before it "opposing parties that are fairly motivated to diligently and effectively present the merits of all sides of the issues presented, thereby facilitating the court's efforts to reach the correct results." *Financial Guar. Ins. v. City of Fayetteville, Ark.,* 943 F.2d 925, 929 (8th Cir.1991).

As between Cowart and Moore, I find and conclude that there is no controversy "of sufficient immediacy and reality to warrant the issuance of declaratory judgment," and in light of Cowart's lack of involvement in this case and the paucity of evidence concerning her, that she is not "motivated to diligently and effectively present the merits" in such a way that the court's efforts to reach the correct result are facilitated.

Accordingly, I shall dismiss Cowart's claims without reaching their merits.

### III.

In utilizing the device of requiring petition circulators to be registered voters for one month in order to limit the otherwise unlimited right to propose changes in the state constitution by the initiative petition process, the Nebraska legislature imposed a statutory restriction on an unlimited state constitutional right that violated the First Amendment guarantee of free speech. Accordingly, Plaintiffs, save for Cowart, are entitled to the relief they seek.

Accordingly,

IT IS ORDERED that judgment shall be entered by separate document as shown below:

Judgment is entered as follows:

1. For the Plaintiffs, except Betty Cowart, and against defendant Scott A. Moore, providing that: (a) Moore is hereby enjoined from rejecting initiative petitions circulated by persons who were not registered to vote or who were registered to vote for less than one month prior to circulation of the petitions; and (b) to the extent that Neb.Rev.Stat. §§ 32–629, 32–630, 32–1404, and 32–1546(1) (Michie 1995) prevent a nonvoter or a registered voter who has been registered to vote for less than one month from circulating an initiative petition, those statutes are herewith declared unconstitutional as being in violation of the First and Fourteenth Amendments to the Constitution;

2. For defendant Scott A. Moore, and against plaintiff Betty Cowart, providing that Cowart's claims are dismissed for lack of subject-matter jurisdiction;

3. Plaintiffs (save for Betty Cowart) are declared prevailing parties, and any claims for attorney fees shall be filed in accordance with the local rules of practice within ten (10) calendar days of this date;

4. Pursuant to Federal Rule of Civil Procedure 58, the court herewith orders that if a timely motion for attorney fees is made, such a motion shall have the same effect under Rule 4(a)(4) of the Federal Rules of Appellate Procedure as a timely motion under Rule 59.